# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JENNIFER L. LOCKE, | CASE NO. 3:13-cv-01884-GBC |
| Plaintiff, | |
| | (MAGISTRATE JUDGE COHN) |
| v. | |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | MEMORANDUM |
| Defendant. | Docs. 1, 10, 11, 12, 13, 14, 15 |

## I.    Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Jennifer Locke for supplemental security income ("SSI") and disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). The ALJ found that Plaintiff could engage in simple, repetitive, routine work in a static work environment with changes in routine that are few and easily explained, limited to occasional, superficial interaction with coworkers and supervisors and no interaction with the public. The ALJ noted that, while Plaintiff needed help two or three days per week, she lived alone with two young children and cared for them by herself on the other days. Plaintiff had maintained a romantic relationship with the father of her children since the seventh grade, could perform activities of daily living, reported that she could handle money, and had worked at various full-time jobs for up to a year.

Plaintiff challenges only three aspects of the ALJ's decision. First, Plaintiff asserts that her borderline intellectual functioning should have been considered a severe impairment at step two. However, the ALJ clearly addressed Plaintiff's intellectual functioning in his RFC

assessment, and included significant mental limitations. Thus, any error at step two was harmless. Second, Plaintiff challenges the ALJ's failure to acknowledge a consultative opinion from 2006, three years prior to the alleged onset date and five years prior to her present application. However, the state agency physician in the present case analyzed this opinion, and, while finding it to be not current, noted the IQ tests results contained within it and limited Plaintiff to simple and routine work. The ALJ discussed and partially adopted the state agency physician's opinion, and implicitly adopted his analysis of the 2006 opinion. Moreover, the 2006 opinion indicated extreme limitations, defined as "no ability" to function, in Plaintiff's ability to work in a routine and usual work setting, but Plaintiff withdrew her application a few months later because she was working full-time. Third, Plaintiff asserts that the ALJ failed to address one of her GAF scores. However, an ALJ is not required to discuss every single piece of evidence. While Plaintiff was assessed a GAF score of 50 in March of 2011, she did not seek mental health treatment until June of 2012, and when she sought treatment in June of 2012, she was assessed a GAF score of 60. Every subsequent GAF score that was before the ALJ was either a 55 or a 60. Thus, the ALJ's failure to cite this single piece of evidence does not undermine the substantial evidence that supports his decision. A reasonable mind could accept the evidence cited by the ALJ as adequate to find that Plaintiff could engage in a range of simple, low-stress work, so the Court will affirm the decision of the Commissioner and deny Plaintiff's appeal.

## II.      Procedural Background

On May 3, 2011, Plaintiff filed an application for SSI under Title XVI of the Act and for DIB under Title II of the Act. (Tr. 209-222). On June 7, 2011, the Bureau of Disability Determination denied these applications (Tr. 75-100), and Plaintiff filed a request for a hearing

on August 29, 2011.  (Tr. 112-114). On February 19, 2013, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 41-71).  On April 5, 2013, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 7-18). On April 5, 2013, Plaintiff filed a request for review with the Appeals Council (Tr. 6), which the Appeals Council denied on June 13, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-5).

On July 10, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On November 20, 2013, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 10, 11). On December 19, 2013, Plaintiff filed a brief in support of her appeal and a statement of material facts ("Pl. Brief"). (Doc. 12, 13). On February 23, 2014, Defendant filed a brief and statement of facts in response ("Def. Brief"). (Doc. 14, 15). On April 29, 2014, the Court referred this case to the undersigned Magistrate Judge. Both parties consented to the referral of this case for adjudication to the undersigned on June 19, 2014, and an order referring the case to the undersigned for adjudication was entered on June 19, 2014. (Doc. 17).

### III.      Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. Johnson v. Commissioner of Social Sec., 529 F.3d 198, 200 (3d Cir. 2008); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence is a deferential standard of review. See Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence." Pierce v. Underwood, 487 U.S. 552, 564 (1988). Substantial evidence requires only "more than a mere scintilla" of evidence, Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999), and may be less than

a preponderance. Jones, 364 F.3d at 503. If a "reasonable mind might accept the relevant evidence as adequate" to support a conclusion reached by the Commissioner, then the Commissioner's determination is supported by substantial evidence. Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999); Johnson, 529 F.3d at 200.

## IV.    Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. See 20 C.F.R. § 404.1520; see also Plummer, 186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. See 20 C.F.R. § 404.1520. The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether the claimant's

impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. See 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC").  20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. See 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

### V. Relevant Facts in the Record

Plaintiff was born on October 31, 1986 and was classified by the regulations as a younger individual through the date of the ALJ decision. 20 C.F.R. § 404.1563. (Tr. 209).   She has a limited education and past relevant work as a material handler, a train cleaner, a cashier, and a warehouse worker. (Tr. 16).

Plaintiff's school records indicated that standardized tests showed that, in February of 2004, Plaintiff could read at a sixth grade level. (Tr. 314). Her word accuracy on graded passages ranged from 92-95% and her comprehension ranged from 55% to 100%. (Tr. 315). On standardized tests that assess math computation without the aid of a calculator, Plaintiff tested at a 6.5 grade level. (Tr. 315). Her individualized education plan noted that Plaintiff "can progress in the general education curriculum with accommodation and adaptations. [Plaintiff] is motivated to be successful in school. When she reads, she uses context clues to help her decode unfamiliar reading. [Plaintiff] needs to increase her reading, written language, and math skills." (Tr. 315). It

indicated that she was interested in joining the military after high school and that her interests include tattooing, four-wheeling, swimming, fishing, hunting, roller blading, and x-games biking. (Tr. 315). Accommodations included the use of a learning classroom to read tests orally, allow her to use a computer for writing/editing, use a Franklin Speller in the classroom, provide extended time for quizzes and tests, and provide a word bank for all fill-in-the blank complete questions. (Tr. 319). The IEP team determined that Plaintiff did not need an extended school year. (Tr. 321). Plaintiff withdrew from school in April of 2004, her eleventh grade year. (Tr. 311).

Plaintiff became pregnant with her first child around January of 2006. (Tr. 462). She filed her first application for benefits on March 27, 2006 (Tr. 74). As part of the previous determination, she was evaluated by Dr. Edward Yelinek, Ph.D. on July 6, 2006. (Tr. 338). She entered her exam with Dr. Yelinek stating "it's a hot muggy day and I'm pregnant." (Tr. 338). She was nineteen years old at the time. (Tr. 338). She indicated that, six months earlier, after a customer complained about an order at the restaurant she worked, she "told [her] mom to come pick [her] up or [she] was going to drive [her] car into a tree." (Tr. 338). Her mother took her to the emergency room, where she calmed down after two hours. (Tr. 338). She explained that she was treating with Dr. Joseph Stewart, D.O., and had been taking lithium and Prozac until she got pregnant. (Tr. 319). She admitted to fairly heavy use of marijuana, "about three times each day for a long time," until she got pregnant. (Tr. 339). She indicated that, over the last six months, she had been living with her parents and cleaning their house, and they seemed to approve of the job she was doing. (Tr. 339). She was angry, anxious, depressed, and had a surly demeanor. (Tr. 340). She indicated poor sleep and poor appetite but good energy. (Tr. 340). She had a good group of friends with whom she associates. (Tr. 340).

Plaintiff's fund of information was poor. She did not know the number of weeks in a year, know the direction the sun rose, and could not perform serial sevens. She could not spell the word world backwards and her attention and concentration were poor. (Tr. 340). "Her ability to perform simple arithmetic calculations remains intact." (Tr. 340). Her range of concept formation was "fairly concrete." (Tr. 340). Her perceptions were intact; there was no evidence of hallucination, obsession, delusion, compulsion, or unusually fears (Tr. 340). Her thought processes appeared goal directed and her memory was intact. (Tr. 340). Her social judgment was poor but her tested judgment was intact. Plaintiff had a full scale IQ of 74, which was in the range of borderline intellectual functioning and the represented the fourth percentile. (Tr. 342). He diagnosed her with Bipolar II Disorder, Borderline Intellectual Functioning, Rule Out Borderline Personality Disorder, and assessed her to have a GAF of 45. (Tr. 342). He opined that she would need assistance managing funds awarded to her, and opined that her prognosis was guarded. (Tr. 342). He opined that she had moderate limitations in her ability to understand, remember, and carry out short instructions and interact with the public. (Tr. 344). He opined that she had marked limitations in her ability to understand, remember, and carry out detailed instructions, make judgments on simple, work-related decisions, and interact appropriately with supervisors and coworkers. (Tr. 344). He opined that she had extreme limitations in her ability to respond appropriately to work pressures in a usual work setting or respond appropriately to changes in a routine work setting. (Tr. 344). Extreme limitations were defined as "no ability to function" in a given area. (Tr. 344).

However, despite Dr. Yelinek's opinion that Plaintiff had no ability to function in her ability to respond appropriately to usual and routine work settings, Plaintiff withdrew her request for applications on May 17, 2007. An order of dismissal dated May 21, 2007 states:

The claimant contacted this office on May 17, 2007. The claimant asked to withdraw the request for hearing, since she is presently working. The record shows that the claimant was fully advised of the effects of this action, including dismissal of the request for hearing with the result that the reconsideration determination [denying benefits] would remain in effect.

(Tr. 74).

On March 26, 2009, Plaintiff had a positive pregnancy test at Waynesboro Hospital. (Tr. 441). However, no fetal heartbeat was detected, so a follow-up sonogram to determine viability was recommended. (Tr. 441). Plaintiff discontinued her lithium upon learning she was pregnant. (Tr. 459).   On April 2, 2009, a follow-up sonogram indicated a fetal heartbeat. (Tr. 438). On June 1, 2009, Plaintiff reported to her gynecologist that she was getting more frustrated at work, but that home was "ok." (Tr. 549). On June 4, 2009, Plaintiff indicated that she was becoming very anxious while working at Save-a-Lot, her chest gets tight, she shakes, and she "can't turn [her] mind off at night." (Tr. 549). She was advised to follow-up with her primary care provider. (Tr. 549).

On October 19, 2009, Plaintiff presented to the emergency room with blood in her urine. (Tr. 379). She was thirty-six weeks pregnant. (Tr. 379). She was admitted, and her psychological exam was within normal limits. (Tr. 352). On October 20, 2009, Plaintiff's mental status examination was within normal limits, she was alert, oriented, cooperative, relaxed, her thoughts were clear, and her memory was intact. (Tr. 357, 359, 362). She was discharged home in stable condition with her significant other. (Tr. 379). Plaintiff continued to have pain, so she had a cesarean section on November 6, 2009. (Tr. 458). She gave birth to a daughter, her postoperative course was uneventful, and she was discharged home two days later. (Tr. 458).

On December 15, 2009, Plaintiff presented to the emergency room at Waynesboro Hospital complaining of left flank pain. She was oriented to people, place, and time, and her

mood and affect were normal. (Tr. 644).

On August 12, 2010, Plaintiff presented to the emergency room at Waynesboro Hospital complaining of a headache. (Tr. 591). She also reported anxiety. (Tr. 591). She was alert and oriented. (Tr. 592).

On November 8, 2010, Plaintiff saw Dr. Joseph Stewart, D.O., her primary care physician at Waynesboro Family Medical Associates. (Tr. 696). She was complaining of numbness, muscle spasms, neck pain, and headache, and Dr. Stewart noted "I feel most of this is all associated with stress and tension." (Tr. 696). He also "counseled [Plaintiff] today, trying to give her more self-esteem and self-confidence." (Tr. 696). He wrote "[s]he is asking whether I can consider her as being permanently disabled to Social Security. I have told her that I don't think so." (Tr. 696). He placed her on Flexeril and told her to follow-up in three weeks if she did not improve. (Tr. 696).

On February 3, 2011, Plaintiff saw Anna Benner, PA-C at Waynesboro. (Tr. 694-95). She was requesting disability forms be filled out. (Tr. 695). She reported mood problems and appeared anxious, so she was referred to a psychiatrist. (Tr. 695). Plaintiff followed-up with Ms. Benner on March 3, 2011. (Tr. 602). She indicated that she had stopped taking lithium because it kept her from sleeping and she did not feel that Xanax was helping her. (Tr. 602). Her speech was slightly pressured. (Tr. 602).

On March 10, 2011, Dr. Syyeda Syed, M.D., performed a psychiatric evaluation. (Tr. 560). Plaintiff reported that she had been treating her bipolar disorder with her primary care physician, Dr. Stewart, for the previous five years, but that her lithium was not working. (Tr. 558). She indicated she stopped taking it the month earlier. (Tr. 559). She reported smoking marijuana two to three times daily. (Tr. 559). She reported up and down moods, with significant

manic and depressive symptoms. (Tr. 559). She also indicated engaging in self-mutilation beginning in the seventh grade, most recently three months previously. (Tr. 558). She stated that it was hard for her to discuss these symptoms and that the interview was making her very upset and frustrated. (Tr. 558). She explained that she dropped out of school in the eleventh grade because she did not like school and everything annoyed and frustrated her. (Tr. 559). She indicated that she had been with her fiancé since seventh grade and had two children with him. (Tr. 559).

Dr. Syed observed that she appeared very guarded and irritable and her affect was agitated. (Tr. 558). Her thought process was incoherent and had loose association, with poor attention and concentration, poor insight, and impaired judgment. (Tr. 559). She was negative for psychosis and cognitively intact. (Tr. 559). She refused to take any medication that would cause weight gain. (Tr. 559). She was also "not interested in therapy" and was strongly advised to stop the use of alcohol and marijuana. (Tr. 560). Dr. Syed diagnosed her with Bipolar II disorder, most recent episode hypomania, anxiety disorder, not otherwise specified, cannabis abuse, rule out dependence, borderline personality disorder, and assessed her a GAF of 50. (Tr. 559). Issues included noncompliance, limited insight, and poor coping skills. (Tr. 559).

On March 23, 2011, an MRI of Plaintiff's cervical spine indicated enhanced signal that showed the possibility of demyelinating disease. (Tr. 573). On March 25, 2011, an MRI of Plaintiff's brain was normal except for "incidental finding of a large mucous retention cyst in the left maxillary sinus and mucosal thickening in the right frontal sinus." (Tr. 570). On March 26, 2011, a follow-up MRI of the cervical spine showed no abnormal enhancement. (Tr. 571).

On April 21, 2011, Plaintiff had a neurological consultation at Wellspan Neurology with Dr. Xi Lin for her right side numbness. (Tr. 665). She noted that Plaintiff's repeat MRI normal

brain and spinal cord without increased enhanced. (Tr. 666). Examination showed decreased sensation on the right. (Tr. 666). She reported fatigue and weight loss, difficulty with concentration, insomnia, and change in mood. (Tr. 666). Her neurological exam showed limb weakness, loss of coordination, loss of sensation, and involuntary movements. (Tr. 666). Objectively, she was alert and oriented to person, place, and time. (Tr. 667). She had "normal affect and expression," "normal memory with normal attention span," "normal speech and volume, no aphasia, good insight with a good fund of knowledge." (Tr. 667).

On May 8, 2011, Plaintiff presented to the emergency room at Waynesboro Hospital with jaw pain. (Tr. 565). She was alert and indicated that she had no emotional issues. (Tr. 565).

On May 11, 2011, Plaintiff followed-up with Dr. Lin. (Tr. 669). She reported that she sometimes "had visual hallucination, and read sentences from paper not seen by others." (Tr. 670). She reported difficulty with concentration, hallucinations, nervousness and mood swings. (Tr. 670). However, she was she was alert and oriented to person, place and time," had "good insight with a good fund of knowledge" and "normal affect and expression." (Tr. 670). She did not make any observations related to her memory or concentration. (Tr. 670).

On May 18, 2011, Plaintiff completed a Function Report. (Tr. 259-69). She indicated that she lives with her children and spends her day making food for them, cleaning, and caring for them. (Tr. 260). She indicated that family members help her care for her children. (Tr. 260). She indicated problems with her personal care as a result of problems in her hand and that she has trouble sleeping. (Tr. 260).She reported that she cleans every day, but that her mother does her laundry. (Tr. 261). She indicated that she can drive, leave the house alone, and shop in stores for up to two hours as long as she was not overwhelmed. (Tr. 262). She reported that she was able to pay bills, count change, handle a savings account, and use money orders. (Tr. 262). She indicated

that she spends time with people every day that she can and goes to her boyfriend's house and spends time with her boyfriend's mother. (Tr. 261). She reported that she has problems getting along with people because she can just "blow up" and does not like to be around people. (Tr. 262). She indicated that she has problems with concentrating, but not memory, completing tasks, or following instructions. (Tr. 262).  She stated that she gets angry around authority figures and "shuts down" and does not handle stress or changes in routine well. (Tr. 262).

On June 10, 2011, Plaintiff's mother completed a Function Report. (Tr. 270-77). She reported that she spends three days a week with Plaintiff doing her laundry, vacuuming, helping with the kids, cooking, and doing dishes. (Tr. 270). She reported that Plaintiff spends her day caring for her children, bathing them, feeding them, cleaning, visiting her boyfriend's mother, playing with them, and putting them to bed. (Tr. 271). She reported that Plaintiff has problems sleeping and problems with her personal care as a result of physical problems. (Tr. 271). She indicated that Plaintiff can do chores, but needs assistance. (Tr. 273). She indicated that Plaintiff can drive, leave the house alone, and go shopping for up to two hours. (Tr. 273). She reported that Plaintiff can pay bills, count change, handle a savings account, and use money orders. (Tr. 273). She indicated that Plaintiff watches television and movies on "good days" and goes on her laptop and to the woods every day. (Tr. 274). She reported that Plaintiff spends time with others but has problems getting along with others. (Tr. 275). She indicated problems with memory, completing tasks, concentration, understanding, following instructions, and getting along with others. (Tr. 275). She reported that Plaintiff can only pay attention for five minutes at a time and does not follow instructions, handle stress, get along with authority figures, or handle changes in routine well. (Tr. 275-76).

On June 2, 2011 and August 12, 2011 Plaintiff followed-up with Dr. Lin. (Tr. 1044,

1047). At both visits, she continued to complain of right upper extremity numbness and tingling. (Tr. 1044, 1047). In her reports of psychological symptoms, she "denie[d] any problem within category." (Tr. 1045, 1048).  She was "alert and oriented to person, place and time," had "good insight with a good fund of knowledge" and "normal affect and expression." (Tr. 1045, 1048). She did not make any observations related to her memory or concentration. (Tr. 1045, 1048).

On September 16, 2011, Plaintiff followed-up with Dr. Lin. (Tr. 1040). She was showing symptoms of a demyelinating condition, and reported lightheadedness and two brief episodes of lapses in awareness. (Tr. 1041). She also reported that, "lately, she has been having episodes of stuttering, slurred speech, and drooling." (Tr. 1041). In her report of psychological symptoms, she "denie[d] any problem within category." (Tr. 1041).  She was "alert and oriented to person, place and time," had "good insight with a good fund of knowledge" and "normal affect and expression." (Tr. 1041). She did not make any observations related to her memory or concentration. (Tr. 1041).

On October 24, 2011, Plaintiff followed-up with Dr. Lin. (Tr. 1036). She thought that her recent steroid injection had helped "tremendously," but complained of recent periodic jerking movements in her right lower extremity. (Tr. 1036). In her report of psychological symptoms, she "denie[d] any problem within category." (Tr. 1037).  She was "alert and oriented to person, place and time," had "good insight with a good fund of knowledge" and "normal affect and expression." (Tr. 1028). She did not make any observations related to her memory or concentration. (Tr. 1037).

On November 14, 2011, an MRI of Plaintiff's brain indicated that the brain was unremarkable in appearance, unchanged from the previous MRI dated May 17, 2011, and that there was a mucous retention cyst in the left maxillary sinus. (Tr. 719). An MRI of the cervical

spine indicated abnormal increased signal intensity similar to the prior study that could indicate demyelinating disease. (Tr. 720).

On December 23, 2011, Plaintiff followed-up with Dr. Lin. (Tr. 1030). Her right extremity paresthesia had responded very well to the steroid injection, but she continued to complain of exquisite tenderness and pain in the lower cervical spine, with limited help from various treatments. (Tr. 1031). In her report of psychological symptoms, she "denie[d] any problem within category." (Tr. 1031). She was "alert and oriented to person, place and time," had "good insight with a good fund of knowledge" and "normal affect and expression." (Tr. 1031). She did not make any observations related to her memory or concentration. (Tr. 1031). The lesion on the right side of her cervical spine was unchanged. (Tr. 1035). She received another steroid injection. (Tr. 1035). She reported pain relief and improved range of motion shortly after the injection. (Tr. 1035).

On February 22, 2012, Plaintiff followed-up with Dr. Lin for her single demyelinating plaque in her cervical spine. (Tr. 1027). In her report of psychological symptoms, she "denie[d] any problem within category." (Tr. 1028). She was "alert and oriented to person, place and time," had "good insight with a good fund of knowledge" and "normal affect and expression." (Tr. 1028). She did not make any observations related to her memory or concentration. (Tr. 1028).

On April 2, 2012, Plaintiff presented to Dr. Joseph Stewart, D.O., complaining of problems concentrating, "especially when it comes to helping her children of following instructions from school to help her children with home work etc." (Tr. 1062). He suggested that she try Adderall 10 mg for two to three weeks then reassess. (Tr. 1062).

On June 12, 2012, Plaintiff was seen at Behavioral Health Services. (Tr. 1023). She

indicated she was more anxious, had trouble sleeping, and was stressed. (Tr. 1023). However, she also indicated that she was doing better and in the process of applying for disability. (Tr. 1023). She was assessed a GAF of 60. (Tr. 1023).

On July 12, 2012, Plaintiff was seen at Behavioral Health Services. (Tr. 1022). She reported that she was doing "ok" and doing "better" and came in for disability paperwork. (Tr. 1022). She was assessed a GAF of 60. (Tr. 1022).

On August 5, 2012 and August 7, 2012, Plaintiff presented to the emergency room at Waynesboro Hospital complaining of severe neck and flank pain. (Tr. 812, 843). She was alert, oriented, and her mood and affect were normal. (Tr. 812). On August 12, 2012, Plaintiff presented to the emergency room at Waynesboro Hospital complaining of continued neck pain. (Tr. 760). She was negative for anxiety, depression, numbness, weakness, and difficulty speaking. (Tr. 760). She was oriented and her mood and affect were normal. (Tr. 761).

On August 13, 2012, Plaintiff was seen at Behavioral Health Services. (Tr. 1021). In her updated treatment plan, she complained of increased anxiety and reported a lot of stress. (Tr. 1021).

On September 13, 2012, Plaintiff followed-up with Dr. Syed. (Tr. 1025). She reported bad anxiety as she had a bad episode two weeks earlier when her father hit her son. (Tr. 1025). She "snapped" on her father and had lost contact with her mother. (Tr. 1025). She was feeling overwhelmed with school and her boyfriend was set to be released from jail in two weeks. (Tr. 1025). However, notes indicate "otherwise mood is stable doing fine" and she was tolerating her medication without side effects. (tr. 1025). On her mental status exam, her thought content was preoccupied with anxiety cognitions. (Tr. 1025). However, she "appeared calm and pleasant, alert and oriented." (Tr. 1025). She made fair eye contact and had normal speech. (Tr. 1025). Her

mood was "'fine' and affect appeared bright." (Tr. 1025). She had no psychomotor agitation or retardation and her thought process was coherent and goal directed. (Tr. 1025). There was no evidence of delusion, she denied hallucination, her attention span was normal, her insight was fair and her judgment was intact. (Tr. 1025). She was assessed a GAF of 55. (Tr. 1025).

On October 10, 2012, Plaintiff presented to the emergency room at Waynesboro Hospital complaining of cramping. (Tr. 962). She was alert, oriented, and had normal mood and affect. (Tr. 962).

On November 13, 2012, Plaintiff followed-up with Dr. Syed. (Tr. 1073). Her boyfriend was out of jail. (Tr. 1073). She was getting along with her father and her "mood [was] on high side not feeling depressed." (Tr. 1073). She reported anxiety, difficulty concentrating, and racing thoughts, but denied change in appetite or energy level, agitation, confusion, delusion, depression, hallucination, homicidal thoughts, suicidal thoughts, loss of interest, obsessive thoughts, compulsive behaviors, sleep pattern disturbance, impulsivity, and panic. (Tr. 1073). On her mental status exam, her thought content was preoccupied with anxiety cognitions. (Tr. 1073). However, she "appeared calm and pleasant, alert and oriented." (Tr. 1073). She made fair eye contact and had normal speech. (Tr. 1073). Her mood was "'fine' and affect appeared bright." (Tr. 1073). She had no psychomotor agitation or retardation and her thought process was coherent and goal directed. (Tr. 1073). There was no evidence of delusion, she denied hallucination, her attention span was normal, her insight was fair and her judgment was intact. (Tr. 1073). She was assessed a GAF of 55. (Tr. 1073).

On December 11, 2012, Plaintiff followed-up with Dr. Syed. (Tr. 1025). She reported that Seroquel sometimes made her sleepy and requested another mood stabilizer. (Tr. 1071). However, she indicated that she only had "some depressed days" and rated her depression as

only as two out of ten (Tr. 1071). She denied agitation, anxiety, confusion, delusions, hallucinations, loss of interest, obsessive thoughts, compulsive behaviors, racing thoughts, sleep pattern disturbance, homicidal thoughts, and suicidal thoughts, impulsivity, and panic. (Tr. 1071). On her mental status exam, her thought content was preoccupied with anxiety cognitions. (Tr. 1071). However, she "appeared calm and pleasant, alert and oriented." (Tr. 1071). She made fair eye contact and had normal speech. (Tr. 1071). Her mood was "'fine' and affect appeared bright." (Tr. 1071). She had no psychomotor agitation or retardation and her thought process was coherent and goal directed. (Tr. 1071). There was no evidence of delusion, she denied hallucination, her attention span was normal, her insight was fair and her judgment was intact. (Tr. 1025). She was assessed a GAF of 55. (Tr. 1071).

On January 9, 2013, Plaintiff followed up with Dr. Syed. (Tr. 1115). She reported "stable mood doing fine" and that she was tolerating her medications with no side effects, but was anxious about her upcoming disability hearing. (Tr. 1115). She reported depression, but denied agitation, anxiety, confusion, delusions, hallucinations, homicidal and suicidal thoughts, loss of interest, obsessive thoughts, compulsive behaviors, racing thoughts, sleep pattern disturbance, impulsivity or panic. (Tr. 1115). On her mental status exam, her thought content was preoccupied with anxiety cognitions. (Tr. 1115). However, she "appeared calm and pleasant, alert and oriented." (Tr. 1115). She made fair eye contact and had normal speech. (Tr. 1115). Her mood was "'fine' and affect appeared bright." (Tr. 1025). She had no psychomotor agitation or retardation and her thought process was coherent and goal directed. (Tr. 1115). There was no evidence of delusion, she denied hallucination, her attention span was normal, her insight was fair and her judgment was intact. (Tr. 1115). She was assessed a GAF of 55. (Tr. 1115).

On February 19, 2013, Plaintiff appeared and testified at the ALJ hearing. (Tr. 43). She

testified that she dropped out of school in the tenth grade because "it just got too hard to understand anything" and had started special education classes in fourth grade for math, English, and reading. (Tr. 45). She testified that she was able to read "a little bit" but that it was "really hard." (Tr. 46). She testified that her mother helped her fill out the social security forms and that she sometimes had to have her mother come over and explain the mail to her. (Tr. 46). She testified that she could pay her bills, but that her parents had to give her checks or money orders that were already filled out because she was unable to fill them out. (Tr. 46). She admitted that she had a driver's license, and had not needed any special accommodations in taking the driver's license test. (Tr. 47). She testified that she needed help caring for her children, ages three and six, but that she only needed help two or three days a week. (Tr. 47). She testified that she did her own laundry and, when asked if she "ever" needed help with laundry, responded "no. Not really. It's not that hard to do" (Tr. 47). She testified that she was able to cook and clean, but that it sometimes takes her all day because her brain gets scattered. (Tr. 47). She explained that when she goes grocery shopping, her father has to take her so she does not "snap out" and act inappropriately. (Tr. 47). She reported that she sometimes has explosive bouts of anger. (Tr. 48).

She testified that her mental impairments caused problems at work because if she could not understand instructions from a supervisor, she would break down emotionally, get angry, and have to leave work. (Tr. 49). She explained that her supervisor had threatened to fire her when this happened, but she quit before they fired her or she got arrested. (Tr. 49). She reported that she had thrown her boyfriend up against a wall and thrown him out of the car while driving when she was not on her medication. (Tr. 50). She testified that her symptoms are "up and down" with treatment but that her medication causes no side effects. (Tr. 51). She testified that her anxiety with having to leave the house, or people asking her questions, caused panic attacks three times

per week. (Tr. 51). She testified that she sometimes gets hallucinations, but that they are difficulty to describe. (Tr. 51). She stated that she could sometimes watch a thirty minute sitcom, but could not watch a two hour movie. (Tr. 56). She reported that she has one friend, but that she does not talk to her very often anymore. (Tr. 57). She testified that she was afraid of leaving the house because she feared she would black out and do something that would cause her to go to jail, and that she had blacked out several times when she got mad. (Tr. 57). She testified that, in her former jobs, she had worked full-time for about a year at each. (Tr. 61)

A vocational expert also appeared and testified. (Tr. 65). Based on the ALJ's RFC, described below, the vocational expert testified that Plaintiff could not perform any past relevant work, but could perform work in the national economy, such as a hand packer, assembler, and sorter. (Tr. 68). The vocational expert also testified that, if an individual with the same RFC could only concentrate for thirty minutes a time, and would need thirty minutes before getting back on track, then there would be no jobs that the individual could perform. (Tr. 69). The vocational expert testified that if an individual would lash out at supervisors such that they could not interact with supervisors at all, then there would be no work in the national economy they could perform. (Tr. 70).

The ALJ issued a decision on April 5, 2013. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since April 30, 2009, the alleged onset date. (Tr. 9). At step two, the ALJ found that Plaintiff's demyelinating disorder of the cervical area, recurrent kidney stones, affective disorder, and cannabis abuse disorder were severe. (Tr. 9).  At step three, the ALJ found that Plaintiff's impairments did not meet or equal a Listing. (Tr.9).

In the step three assessment, the ALJ cited to Dr. Syed's observation on March 10, 2011, that Plaintiff was a "bad historian" and refused to take any medications that would cause weight

gain. (Tr. 11, 558-59). The ALJ also noted that, after this evaluation, Plaintiff did not receive any mental health treatment until June 13, 2012. (Tr. 11). The ALJ cited to Plaintiff's September 13, 2012 visit when she stated her mood was stable and doing fine and denied most symptoms, along with the December 11, 2012 visit when she denied any significant symptoms besides intermittent depression. (Tr. 11).

In evaluating Plaintiff's activities of daily living, the ALJ pointed out that Plaintiff raises two young children, ages three and six, and lives alone with them. (Tr. 12). The ALJ also noted that, while Plaintiff needs help two or three times per week, but she independently raises the children the majority of the time. (Tr. 12). In evaluating Plaintiff's social functioning, the ALJ acknowledged that she testified that she has episodes of "acute anger" where she will "snap out" at acquaintances and strangers. (Tr. 12). However, the ALJ noted that she is able to maintain a romantic relationship, has at least one friend, raises two young children, has a working relationship with her friends and family, as they help her raise the children, and is able to leave the home alone and shop in stores. (Tr. 12). In evaluating Plaintiff's concentration, persistence, and pace, the ALJ noted that mental status examinations from Summit Behavioral Health had been unremarkable, and had displayed normal attention span with coherent and goal directed thought processes. (Tr. 12). The ALJ acknowledged that she had a history of special education with residual difficulties with mathematics and reading, and testified that she needed assistance filling out forms in her application for benefits. (Tr. 12). The ALJ also acknowledged that she has difficulty handling stress or changes in routine. (Tr. 12). However, the ALJ noted that she can handle money and perform other basic daily activities that require preserved concentration, persistence, or pace. (Tr. 12).

The ALJ found that Plaintiff had the RFC to perform light work but is unable to perform

overhead work with the left upper extremity, is limited to simple, repetitive, routine work in a static work environment with changes in routine that are few and easily explained, limited to occasional, superficial interaction with coworkers and supervisors and no interaction with the public. (Tr. 13).  In making this RFC assessment, the ALJ evaluated the only medical opinion during the relevant period-the assessment by Dr. Small-and evaluated Plaintiff's credibility. The ALJ found that Plaintiff was not fully credible because of her reported substance abuse, the timing of her disability requests and filings, internal inconsistencies, her lack of medical treatment, and activities of daily living that included caring for two young children on her own four to five days per week. The ALJ partially adopted Dr. Small's opinion, which indicated moderate limitations, but found her to be more limited that he alleged based on her testimony and medical evidence.

Specifically, the ALJ discounted Plaintiff's credibility based on her reported use of marijuana two to three times daily. (Tr. 16). The ALJ further discounted Plaintiff's credibility because her alleged onset date "corresponds to approximately two weeks after the claimant found out she was unexpectedly pregnant." (Tr. 4).  The ALJ noted that Plaintiff requested permanent disability at her very first appointment with her primary care physician regarding neck pain, to which her doctor responded "I don't think so." (Tr. 14). The ALJ also noted that Plaintiff filed for disability less than one month after one MRI showed a lesion, without waiting to see if she responded to treatment. (Tr. 14).

The ALJ also found that Plaintiff and Plaintiff's mother's function reports were not credible because they were internally inconsistent, explaining that "claimant reported that her mother does her laundry, but at the hearing, she testified it 'is not hard to do' and she does it herself." (Tr. 15-16). The ALJ also found Plaintiff's and her mother's report that she has

difficulty feeding herself to be incompatible with raising two young children by herself four to five days per week. (Tr. 16).   The ALJ also found her reported difficulty bathing to be incompatible with her ability to drive a car, leave the home alone, and shop in stores. (Tr. 16). Finally, the ALJ cited to Plaintiff's lack of medical treatment, noting that Plaintiff never returned to care with her neurologist after February 22, 2012. (Tr. 15). The ALJ noted that Plaintiff did not receive mental services after the initial evaluation in March of 2011 until June of 2012. (Tr. 16). The ALJ cited to a lack of clinical findings that show extreme mental impairments, unremarkable mental status examinations from Summit Behavioral Health, and the fact that Dr. Syed "consistently assessed . . . [GAF] scores of 55, consistent with moderate symptoms or moderate difficulty in social, occupational, or school functioning."  (Tr. 16).

The ALJ noted that Dr. Small opined that Plaintiff could meet the basic demands of simple, routine work. (Tr. 15). However, the ALJ felt that additional limitations were necessary. The ALJ found Plaintiff's allegations of deficits in social functioning to be partially credible, and limited her to occasional, superficial interaction with coworkers and supervisors and none from the public. (Tr. 15). The ALJ also found that Plaintiff should be limited to simple, repetitive, routine work in a static work environment with changes in routine that are few and easily explained because she had a history of special education and "reported the ability to read and write, but has difficulty understanding complex material. For example, she testified she needed assistance filling out forms in her application for benefits. By contrast, she stated she can handle money." (Tr. 15). However, the ALJ found that further limitations were not necessary because, "despite the history of special education, claimant's activities of daily living reflect a greater level of mental functioning than alleged. Most notably, claimant raises two children, ages three and six. She lives alone with her two children…[and] needs help two to three times per week, but

she independently raises the children the majority of the time." (Tr. 15).

## VI.    Plaintiff Allegations of Error

### A.    The ALJ's failure to find that Plaintiff's borderline intellectual functioning was a severe impairment

Plaintiff asserts that the ALJ failed to discuss Plaintiff's borderline intellectual functioning, as demonstrated by the IQ scores in Dr. Yelinek's opinion, education records, and her testimony regarding her difficulties filling out checks and social security disability forms. (Pl. Brief at 7). Plaintiff argues that, because the ALJ did not find borderline intellectual functioning to be a specific, severe impairment at step two, he did not account for it in his RFC assessment. (Pl. Brief at 7). Plaintiff also asserts that the ALJ mischaracterized her testimony regarding her ability to manage money, because there was evidence she could not manage benefits, and mischaracterized her ability to read and write. (Pl. Brief at 7).

At step two, the social security regulations contemplate that the administrative law judge first consider whether there are any medically determinable impairments and then determine whether any of the medically determinable impairments are "severe." 20 C.F.R. § 404.1529.  An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities.  Id. § 404.1521. Generally, an error at step two is harmless because it is a threshold test. Id. § 404.1520(c)-(g). As long as one impairment is found to be severe, all medically determinable impairments are considered at subsequent steps, including non-severe impairments. Id.; Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005); Salles v. Comm'r of Soc. Sec., 229 F. App'x 140, 149 (3d Cir. 2007). For instance, in Rutherford, an error at step two was harmless and did not impact subsequent steps because the claimant there "never mentioned obesity as a condition that contributed to her inability to work."  Id.

Here, the ALJ addressed each piece of evidence Plaintiff contends establishes her

borderline intellectual functioning, and accommodated this limitation by finding that Plaintiff should be limited to simple, repetitive, routine work in a static work environment with changes in routine that are few and easily explained. In his discussion of concentration, persistence, and pace, the ALJ acknowledged that she had a history of special education with residual difficulties with mathematics and reading, and testified that she needed assistance filling out forms in her application for benefits. (Tr. 12). However, the ALJ noted that she can handle money and perform other basic daily activities that require preserved concentration, persistence, or pace. (Tr. 12). The ALJ again cited Plaintiff's education records and her testimony regarding her ability to read and write in the RFC assessment.  The ALJ again noted her history of special education and that Plaintiff "reported the ability to read and write, but has difficulty understanding complex material. For example, she testified she needed assistance filling out forms in her application for benefits. By contrast, she stated she can handle money." (Tr. 15). The ALJ continued, "despite the history of special education, claimant's activities of daily living reflect a greater level of mental functioning than alleged. Most notably, claimant raises two children, ages three and six. She lives alone with her two children…[and] needs help two to three times per week, but she independently raises the children the majority of the time." (Tr. 15). Thus, the ALJ repeatedly and explicitly addressed Plaintiff's ability to read and write and her history of special education.

With regard to the IQ scores, the ALJ specifically addressed Dr. Small's opinion. Dr. Small specifically acknowledged Plaintiff's IQ score in his narrative explanation of his opinion. Despite Plaintiff's IQ scores, Dr. Small noted that Plaintiff had been able to hold four jobs, lived with and cares for her children, and is able to cook and clean, and was consequently able to meet the basic demands of work. Because the ALJ assessed and adopted Dr. Small's opinion, and accepted Dr. Small's limitation to simple and routine work, the Court is able to discern that the

ALJ accommodated for Plaintiff's IQ scores in the RFC assessment. Consequently, the ALJ addressed all of the factors relevant to Plaintiff's intellectual functioning and accommodated them in his RFC assessment. Thus, any failure to find that her borderline intellectual functioning was severe at step was harmless error.

      **B.**      **The ALJ's failure to discuss a GAF score and Dr. Yelinek's 2006 opinion**

Plaintiff asserts that the ALJ failed to acknowledge Dr. Yelinek's 2006 opinion and Dr. Syed's initial GAF score of 50, and that this failure renders the RFC assessment defective. However, with regard to Dr. Yelinek's opinion, Dr. Small explicitly addressed this opinion and found it be "not current." (Tr. 262). The ALJ acknowledged and partially adopted Dr. Small's opinion. This is sufficient consideration for Dr. Yelinek's opinion.

Moreover, Dr. Yelinek's opinion not only predated the pertinent period-it was completed a full three years prior to the pertinent period. Evidence that predates the pertinent period is not inherently irrelevant. However, Dr. Yelinek's opinion was dated in July of 2006. Plaintiff filed a request for a hearing for her first denial of benefits in September of 2006. On May 17, 2007, she contacted the state agency and requested that her application be dismissed because she had resumed working. Dr. Yelinek opined that Plaintiff had "no ability" to work, but she was able to return to working full-time shortly thereafter. Plaintiff's intervening ability to resume working, coupled with the length of time that had passed, renders any failure to assign weight harmless because no reasonable person would have found it to be entitled to any significant weight. Rutherford v. Barnhart, 399 F.3d 546, 552-53 (3d Cir. 2005) (remand is not required when it would not affect the outcome of the case).

With regard to the GAF score of 50, an ALJ is not required to cite every piece of evidence. Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004) (ALJ is not required to "use

particular language or adhere to a particular format in conducting his analysis" and instead must only "ensure that there is sufficient development of the record and explanation of findings to permit meaningful review."). Plaintiff is essentially challenging the ALJ's RFC assessment. However, despite Plaintiff's IQ tests, her claimed intellectual limitations, the GAF score of 50, and Dr. Yelinek's 2006 assessment, substantial evidence supports the ALJ's decision that Plaintiff could engage in simple, repetitive, routine work in a static work environment with changes in routine that are few and easily explained, limited to occasional, superficial interaction with coworkers and supervisors and no interaction with the public. (Tr. 13).

Plaintiff's school records indicated that standardized tests showed Plaintiff could read at a sixth grade level. (Tr. 314). Her word accuracy on graded passages ranged from 92-95% and her comprehension ranged from 55% to 100%. (Tr. 315). On standardized tests that assess math computation without the aid of a calculator, Plaintiff tested at a 6.5 grade level. (Tr. 315). Her individualized education plan noted that Plaintiff "can progress in the general education curriculum with accommodation and adaptations. [Plaintiff] is motivated to be successful in school. When she reads, she uses context clues to help her decode unfamiliar reading." (Tr. 315).

Plaintiff was not seeking treatment for mental health issues at the time of either of her applications. (Tr. 74, 209). She filed her first application shortly after learning she was pregnant and set her alleged onset date for the second application the month after she learned she was pregnant. (Tr. 74, 209, 441, 462). She requested that her primary care physician find her permanently disabled the first time she saw him for neck pain, to which he responded "I don't think so." (Tr. 696). She filed for disability shortly after an MRI indicated abnormal enhancement in her cervical spine, without waiting to see if it would improve with treatment. (Tr. 209, 573).

Plaintiff's mental status exams, including memory and thought process, were normal throughout her pregnancy (Tr. 352, 357, 359, 362). Plaintiff reported anxiety and mood problems in February of 2011, and had a psychiatric evaluation in March of 2011, but she was "not interested in therapy." (Tr. 560). She did not begin receiving mental health treatment until June of 2012. (Tr. 1023). Dr. Syed identified "noncompliance" as one of Plaintiff's issues. (Tr. 559). She reported "fairly heavy" marijuana use in 2006 and 2011. (Tr. 339, 560). Every mental status examination she had with Dr. Lin was normal, with findings including "normal affect and expression," "normal memory with normal attention span," and "normal speech and volume, no aphasia, good insight with a good fund of knowledge." (Tr. 667, 670, 1028, 1031, 1037, 1041, 1045, 1048). At every visit with Dr. Lin after May of 2011, she specifically "denie[d] any problem" with psychological symptoms. (Tr. 1028, 1031, 1037, 1041, 1045, 1048). Although Dr. Syed assessed Plaintiff with a GAF of 50 in March of 2011, she was assessed a GAF of 60 when she began treatment in June of 2012. (Tr. 1023). She was again assessed a GAF of 60 in July of 2012. (Tr. 1022). At Plaintiff's September 2012, November 2012, December 2012, and January 2013 visits with Dr. Syed, her thought process was coherent and goal directed, there was no evidence of delusion, she denied hallucination, her attention span was normal, her insight was fair and her judgment was intact, and she was assessed a GAF of 55. (Tr. 1025, 1071, 1073, 1115). The ALJ properly acknowledged and characterized this medical evidence in assessing Plaintiff's RFC.

The ALJ properly noted that, although both Plaintiff and her mother reported that her mother did Plaintiff's laundry, Plaintiff testified that she did her laundry herself and that it was not "that hard." (Tr. 47, 261, 270). The ALJ also properly noted that Plaintiff reported she lived with her children alone, only needed help three days per week, at most, and spends her day

making food for them, cleaning, and caring for them. (Tr. 260). Both Plaintiff and her mother reported that she was able to pay bills, count change, handle a savings account, and use money orders. (Tr. 262, 273). The ALJ also cited to Plaintiff's ability to work various full-time jobs for up to a year. (Tr. 57-61). A reasonable mind would accept this evidence as adequate to conclude that Plaintiff could perform simple work in low-stress environments, despite her early GAF score of 50 and Dr. Yelinek's 2006 report. Consequently, substantial evidence supports the ALJ's decision.

Plaintiff referred to treatment notes from March and April of 2013 from Dr. Syed in her brief, but these records were not before the ALJ. (Tr. 5). Instead, they were submitted to the Appeals Council. When the Appeals Council denies review, evidence that was not before the ALJ may only be used to determine whether it provides a basis for remand under sentence six of section 405(g), 42 U.S.C. ("Sentence Six"). Szubak v. Secretary of Health and Human Servs., 745 F.2d 831, 833 (3d Cir. 1984). Sentence Six requires a remand when evidence is "new" and "material," but only if the claimant demonstrated "good cause" for not having incorporated the evidence into the administrative record. Id. In order to be material, "the new evidence [must] relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." Id. The relevant time period is "the period on or before the date of the [ALJ's] hearing decision." 20 C.F.R. § 404.970(b); Mathews v. Apfel, 239 F.3d at 592. The materiality standard also "requires that there be a reasonable possibility that the new evidence would have changed the outcome of the Secretary's determination." Szubak, 745 F.2d at 833.

Here, to the extent these records relate to the relevant period, Plaintiff has asserted no good cause for their omission from the record before the ALJ. Moreover, these records indicate a

deterioration in Plaintiff's mental state, and are therefore not material to the relevant period. For instance, they show that Plaintiff had been kicked out of her house when police "busted" to get her boyfriend who stole from Walmart and was living at his mother's house with twelve other children and she was "feeling crazy because of her living situation, and going into withdrawal of pain medication." (Tr. 1133). She was assessed a GAF of 50. (Tr. 1133). In April of 2013, she had only "partial" insight and her "mood was 'crazy' and affect appeared irritable." (Tr. 1136). She was assessed a GAF of 50. (Tr. 1136). As Plaintiff noted in her request for review to the Appeals Council, Plaintiff's GAF had been "downgraded to a 50." (Tr. 1132). Thus, the records that existed during the relevant period were not omitted for good cause and the records that did not yet exist during the relevant period do not relate to the relevant period because they demonstrate a subsequent deterioration. Consequently, the Court will not consider these records or remand pursuant to Sentence Six.

## VII.    Conclusion

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1382c; Brown, 845 F.2d at 1213; Johnson, 529 F.3d at 200; Pierce, 487 U.S. at 552; Hartranft, 181 F.3d at 360; Plummer, 186 F.3d at 427; Jones, 364 F.3d at 503. Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971). Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands.

Monsour Med. Ctr., 806 F.2d at 1190. Here, a reasonable mind might accept the relevant evidence as adequate. Accordingly, the Court will affirm the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

An appropriate Order in accordance with this Memorandum will follow.

Dated: September 30, 2014                          _____s/Gerald B. Cohn_____
                                                                    GERALD B. COHN
                                                                    UNITED STATES MAGISTRATE JUDGE